UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**SEALED**

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 19-10214 |
| v. | Violations: |
| (1) ALEX YUN CHEONG YUE, | Count One: Conspiracy to Commit Export Violations (50 U.S.C. § 1705) |
| (2) WAI KAY VICTOR ZEE, and | |
| (3) PREMIUM TECH SYSTEMS, LTD. | Count Two and Three: Unlawful Exports and Attempted Unlawful Exports of U.S. Goods to Hong Kong (50 U.S.C. § 1705) |
| Defendants. | |
| | Count Four: Smuggling (18 U.S.C. § 554) |
| | Forfeiture Allegation: (18 U.S.C. §§ 981(a)(1)(C) & 28 U.S.C. § 2461(c)) |

INDICTMENT

At all times relevant to this Indictment:

Introductory Allegations

A. **The Defendants**

1. ALEX YUN CHEONG YUE ("YUE") was born in Hong Kong, and first entered the United States in or about March 2003. In or about November 2008, YUE became a naturalized United States citizen. Beginning in at least 2012, YUE resided in South El Monte, California.

2. WAI KAY VICTOR ZEE ("ZEE") was born in Hong Kong, and currently resides in Hong Kong, which is a Special Administrative Region of the People's Republic of China.

3. PREMIUM TECH SYSTEMS LIMITED ("PREMIUM TECH") was a private company formed on or about March 25, 2003. PREMIUM TECH was owned and operated by ZEE, who served as its sole director. PREMIUM TECH was located in Hong Kong.

B.   **The United States Company**

4.   Company A was a California-based company that provided semiconductor and systems solutions to customers in the aerospace, defense, communications, and network data industries. Among the products that Company A sold were extremely precise timekeeping technologies, including cesium atomic clocks that were accurate time and frequency standards. The cesium atomic clocks were used in Global Positioning System solutions, network timing protocols, encryption programs, and national defense and space applications. Company A manufactured and shipped the cesium atomic clocks from its facility in Beverly, Massachusetts.

C.   **United States Export Regulations**

5.   Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, the President of the United States is granted authority to deal with unusual threats to the national security and foreign policy of the United States. The President, under IEEPA, can declare a national emergency through executive orders that have the full force and effect of law.

6.   On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to U.S. goods and technologies, and continued in effect the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774. The President has issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present. *See, e.g.*, 83 Fed. Reg. 39,871 (Aug. 8, 2018).

7.   Section 734.3 of the EAR provides that, except for certain limited and enumerated categories, all items made, wholly or in part, in the United States, wherever located, are subject to the EAR. The EAR prohibits any person from exporting or causing the exportation from the United States of a controlled commodity without having first obtained a validated export license from the U.S. Department of Commerce unless an exception applies.

8. The EAR controls, among other things, the export and re-export to foreign countries of commercial items that also have a military application. The EAR places limitations on the export of those goods and technology that the Secretary of Commerce deems could make a significant contribution to the military potential of other countries, could prove detrimental to the national security of the United States, or are contrary to the foreign policy of the United States. The Department of Commerce maintains the Commerce Control List ("CCL"), which specifies the most sensitive goods and technologies subject to the EAR. Depending on the nature of the item, the destination country, the end-use, and the end-user of the item, a validated license from the Department of Commerce may be required for export.

9. For all exports valued over $2,500 or for which an export license is required for shipment outside of the United States, the U.S. seller, manufacturer, exporter, or its shipping agent is required to file information with the United States Government, which enables the government "to prevent the export of certain items to unauthorized destinations and/or end users." 15 C.F.R. § 30.1(b). This information is submitted electronically by filing Electronic Export Information ("EEI") in the Automated Export System ("AES") with the United States government. The purpose of this filing requirement is to "strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and/or end users because AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation." 15 C.F.R. § 30.1(b). For each export transaction, pursuant to 15 C.F.R. § 30.6, the following information, among other things, is required to be filed in AES: the names and addresses of the parties to the transaction; the description, quantity, and value of the items exported; the ultimate consignee (end user); the country of ultimate destination; the Export Control Classification Number ("ECCN") for the items being exported; and if applicable, the export license number. By

filing this information with the United States Government, the filer is certifying that the EEI information is true, accurate, and complete. 15 C.F.R. § 758.1(f). Knowingly providing false or misleading information, or causing such information to be provided, in connection with the preparation and submission of "export control documents," including EEI filings, is a violation of the EAR. 15 C.F.R. § 764.2(g)(1)(ii); *see* 15 C.F.R. § 772.1 (EAR defines an "Export control document" to include, among other things, "EEI on the Automated Export System (AES) presented in connection with shipments to any country"). Similarly, concealing information from the Department of Commerce or U.S. Customs Service by failing to file EEI in connection with an export also violates the EAR. *See* 15 C.F.R. § 764.2(g)(1).

10. Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute, including the EAR.

11. Company A's cesium atomic clocks are classified by the Department of Commerce as ECCN 3A002.g.2, and controlled for export for anti-terrorism and national security reasons. Under the EAR, a license from the Department of Commerce was required to export the cesium atomic clocks from the United States to Hong Kong.

## COUNT ONE
### Conspiracy to Commit Export Violations
### (50 U.S.C. § 1705)

The Grand Jury charges:

12. The allegations contained in paragraphs 1 through 11 of this indictment are re-alleged and incorporated as if set forth fully herein.

13. Beginning on a date unknown to the Grand Jury, but no later than December 2015, and continuing thereafter until in or about July 2018, in the District of Massachusetts and elsewhere, the defendants

(1) ALEX YUN CHEONG YUE,
(2) WAI KAY VICTOR ZEE, and
(3) PREMIUM TECH SYSTEMS LIMITED,

did knowingly and willfully conspire, combine, confederate and agree with one another and with other persons known and unknown to the Grand Jury to export and cause the export of U.S.-origin controlled commodities from Company A, located in Massachusetts, to Hong Kong, without first obtaining the required licenses from the United States Department of Commerce and filing EEI in connection with the exports of the controlled commodities, in violation of 50 U.S.C. § 1705 and 15 C.F.R. §§ 736.2(b)(1), 764.2(a), and 764.2(h).

### OBJECTS OF THE CONSPIRACY

14. The objects of the conspiracy were:

A. to acquire U.S.-origin controlled commodities, primarily cesium atomic clocks, from Company A in the United States for export to PREMIUM TECH in Hong Kong;

B. to conceal from Company A and the United States government that the U.S.-origin controlled commodities were destined for end-users in Hong Kong;

C. to make a financial profit for YUE, ZEE, and PREMIUM TECH; and

5

D. to evade the regulations, prohibitions, and licensing requirements of the EAR.

## MANNER AND MEANS

15. The manner and means by which the conspiracy was sought to be accomplished included, among other things, the following during the dates of the alleged conspiracy:

A. Defendants YUE and ZEE used e-mail accounts and other forms of communication to communicate with each other between the United States and Hong Kong, and to communicate with companies, including Company A, inside the United States;

B. Defendant YUE used a fictitious company, Ecycle Tech International, LTD ("Ecycle"), to purchase U.S.-origin controlled commodities from Company A in the United States on behalf of defendants ZEE and PREMIUM TECH;

C. Defendant YUE represented to Company A that the U.S.-origin controlled commodities would be used only inside the United States;

D. Defendant YUE instructed Company A to ship the purchased U.S.-origin controlled commodities to an address in California;

E. After receiving the U.S.-origin controlled commodities in California, defendant YUE exported them to defendants ZEE and PREMIUM TECH in Hong Kong;

F. Defendant ZEE wired money from bank accounts outside the United States to defendant YUE for payment for the U.S.-origin controlled commodities;

G. Defendants YUE, ZEE, and PREMIUM TECH caused the U.S.-origin controlled commodities to be exported from the United States to Hong Kong without first obtaining a license from the United States Department of Commerce.

## OVERT ACTS

16. In furtherance of the conspiracy, and to accomplish its purposes and objectives, at least one of the conspirators committed or caused to be committed, in the District of Massachusetts and elsewhere, at least one of the following overt acts, among others:

### THE 2016 ILLEGAL EXPORT

(i) On or about December 2, 2015, YUE sent an e-mail to a reseller for Company A requesting quotes for two cesium atomic clocks and a wideband distribution amplifier.

(ii) On or about December 2, 2015, in response to an inquiry from the reseller about the distribution amplifier in which YUE was interested, YUE forwarded the inquiry e-mail to ZEE in Hong Kong.

(iii) On or about December 2, 2015, ZEE sent an e-mail to YUE informing him to tell the reseller that he had bought this distribution amplifier model before, and would like to buy it again.

(iv) On or about December 4, 2015, in response to inquiries from the reseller about where the cesium atomic clocks would be used, YUE informed them that Ecycle was "setting up a manufacturing plant for cordless phone [research & development] and pilot production" in Southern California.

(v) On or about December 4, 2015, YUE forwarded the quote from Company A for the cesium atomic clocks and wideband distribution amplifier to ZEE in Hong Kong. The total quoted price was approximately $130,522 before shipping charges.

(vi) On or about February 16, 2016, YUE sent a wire transfer to Company A for approximately $142,268.98 for purchase of the cesium atomic clocks and wideband distribution amplifier.

(vii) On or about February 19, 2016, Company A shipped the cesium atomic clocks and wideband distribution amplifier in three shipments from its business in Beverly, Massachusetts to YUE in California.

(viii) On or about February 22, 2016, YUE shipped three packages to ZEE at PREMIUM TECH in Hong Kong. On the airway bills, YUE falsely indicated that the packages contained servers valued between $500 and $2000.

(ix) On or about February 22, 2016, YUE sent an e-mail to ZEE writing, "[p]lease be advised that parcel arrived this morning. It was processed and sent the same day, should arrive on Thursday." Following the message, YUE listed the tracking numbers for the three packages YUE shipped to ZEE at PREMIUM TECH in Hong Kong.

(x) On or about February 24, 2016, ZEE sent an e-mail to YUE confirming that the Company A goods had arrived in Hong Kong.

### THE 2017 ATTEMPTED ILLEGAL EXPORT

(xi) On or about December 13, 2017, YUE sent a purchase order to Company A for the purchase of an additional cesium atomic clock.

(xii) On or about April 22, 2018, in response to Company A's request that he fill out an end user certificate, YUE sent a statement on Ecycle letterhead stating the cesium atomic clock would be used in a calibration lab in California.

(xiii) On or about May 9, 2018, in response to Company A's request for further information, YUE replied, "I think you make a mistake, this product is not for export purpose."

(xiv) On or about May 25, 2018, following its request to visit the California location where the cesium atomic clock would be used, YUE sent an e-mail to Company A cancelling the order.

8

(xv)    On or about July 13, 2018, YUE received a refund payment from Company A in the amount of $68,210.

(xvi)   On or about July 15, 2018, ZEE sent an e-mail to YUE in which he wrote, "[y]ou can TT the amount back or use US$ bank draft to send back the money to my company. If you use bank draft, please use 'Premium Tech Systems Ltd' as payee. The company account information is attached for your reference." Attached to the e-mail was bank account information for PREMIUM TECH in Hong Kong.

(xvii)  The following day, on or about July 16, 2018, YUE sent a wire transfer to PREMIUM TECH in the amount of $68,160 to the bank account in Hong Kong.

All in violation of Title 50, United States Code, Section 1705.

## COUNTS TWO AND THREE
Unlawful Exports or Attempted Unlawful Exports of U.S.-Origin Goods to Hong Kong
(50 U.S.C. § 1705)

The Grand Jury further charges:

17. The allegations contained in paragraphs 1 through 11 of this indictment are re-alleged and incorporated as if set forth fully herein.

18. On or about the dates listed as to each count below, within the District of Massachusetts and elsewhere, the defendants

(1) ALEX YUN CHEONG YUE,
(2) WAI KAY VICTOR ZEE, and
(3) PREMIUM TECH SYSTEMS LIMITED,

did knowingly and willfully export, attempt to export, and cause to be exported the U.S. origin goods listed in Counts Two and Three from the United States to Hong Kong, without first obtaining the required license from the United States Department of Commerce:

| Count | Approx. Date of Export | Item Description | Destination |
|---|---|---|---|
| 2 | February 22, 2016 | Cesium atomic clocks | Hong Kong |
| 3 | December 13, 2017 | Cesium atomic clock | Hong Kong |

All in violation of Title 50, United States Code, Section 1705 and Title 18, United States Code, Section 2.

<div align="center">COUNT FOUR<br>Smuggling<br>(18 U.S.C. § 554)</div>

The Grand Jury further charges:

19. The allegations contained in paragraphs 1 through 11 of this indictment are re-alleged and incorporated as if set forth fully herein.

20. On or about February 22, 2016, in the District of Massachusetts and elsewhere, the defendants

    (1) ALEX YUN CHEONG YUE,
    (2) WAI KAY VICTOR ZEE, and
    (3) PREMIUM TECH SYSTEMS LIMITED,

did fraudulently and knowingly buy, sell, receive, and facilitate the transportation, concealment, and sale of merchandise, articles, and objects described more fully below, contrary to the laws and regulations of the United States; and did fraudulently and knowingly export and send and cause to be exported and sent from the United States merchandise, articles, and objects contrary to the laws and regulations of the United States, that is, 50 U.S.C. § 1705 and 15 C.F.R. §§ 736.2(b)(1), 764.2(a), and 764.2(h):

| Count | Approx. Date of Export | Item Description | Destination |
|---|---|---|---|
| 4 | February 22, 2016 | Cesium atomic clocks | Hong Kong |

All in violation of Title 18, United States Code, Sections 554 and 2.

## EXPORT AND SMUGGLING FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

21. Upon conviction of one or more of the offenses set forth in Counts One through Four of this Indictment, the defendants

> (1) ALEX YUN CHEONG YUE,
> (2) WAI KAY VICTOR ZEE, and
> (3) PREMIUM TECH SYSTEMS LIMITED,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

22. If any of the property described in Paragraph 19, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON OF THE GRAND JURY

George P. Varghese
Assistant U.S. Attorney

DISTRICT OF MASSACHUSETTS, Boston, MA June 25, 2019

Returned into the District Court by the Grand Jurors and filed.

Thomas F. Q...
Deputy Clerk
6/25/19
@ 3:55pm