UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-CR-10214-IT |
| | ) | |
| (1) ALEX YUN CHEONG YUE, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States moves this Court to sentence Defendant to 46 months of imprisonment (the low end of the guideline sentencing range), 36 months of supervised release, a fine within the guideline sentencing range of $20,000 to $200,000, forfeiture of $5,690.67, and a $400 mandatory special assessment.

### *Facts and Legal Background*

Defendant Yue is a naturalized United States citizen who lived in South El Monte, California.  He was born in Hong Kong.  His alleged co-conspirator was also in Hong Kong, as was the co-conspirator's company.

Defendant violated export controls that protect the United States from threats to U.S. national security and foreign policy.  To do so, the export controls require each person to obtain a government license before he exports certain important or sensitive goods out of the United States to a foreign country.  Not surprisingly, these controlled commodities include commercial items that have a military application, especially those that the Secretary of Commerce deems could make a significant contribution to other countries' military potential, could damage the United States' national security, or are contrary to the foreign policy of the United States.  Depending on the nature of the item, the destination country, the end-use, and the end-user of the item, a validated

license from the Department of Commerce may be required for export.  The Department of Commerce cares about the item's true nature, its true destination country, its true end-use, and its true end-user because some exports deserve a license because they are safe, and others do not deserve a license because they pose a national security or foreign policy danger.

For all exports valued over $2,500 or for which an export license is required, the U.S. seller, manufacturer, exporter, or its shipping agent must file information with the United States Government, which enables the government "to prevent the export of certain items to unauthorized destinations and/or end users."  15 C.F.R. § 30.1(b).  The purpose of this filing requirement is to "strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and/or end users because AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation."  15 C.F.R. § 30.1(b).  Concealing information from the Department of Commerce or U.S. Customs Service by failing to file information in connection with an export also violates the law.  *See* 15 C.F.R. § 764.2(g)(1).

Here, Defendant exported, attempted to export, and conspired to export devices from a company that provided semiconductor and systems solutions to customers in the aerospace, defense, communications, and network data industries.  One of its products contained extremely precise timekeeping technologies, including cesium atomic clocks that were accurate time and frequency standard for use in Global Positioning System solutions, network timing protocols, encryption programs, and national defense and space applications.

These cesium atomic clocks are classified by the Department of Commerce as ECCN 3A002.g.2, and controlled for export for anti-terrorism and national security reasons.  Defendant needed a Department of Commerce license to export the cesium atomic clocks from the United States to Hong Kong from December 23, 2014 on.  He never got one, and instead concealed the

true end-use, the true end-user, and the true destination country from sellers who respected the export control laws even though Defendant did not.

In late 2015, Defendant emailed a reseller to obtain cesium atomic clocks and a wideband distribution amplifier. When the reseller asked Defendant where the atomic clocks would be used, Defendant responded that he was setting up a plant to research, develop, and produce cordless phones in Southern California. This was false, and the company he identified himself with was a front. Defendant intended instead to send the clocks with military applications on to Hong Kong, for which he needed a U.S. government license. The devices cost about $130,000 before shipping, about $142,000 with shipping included. Defendant paid for the devices and had them sent to him in California, thus perpetuating his lie that the end-use and end-user were located in California. Defendant then shipped the packages to his client in Hong Kong. When doing so, Defendant falsely listed the packages as containing servers valued between $500 and $2,000. The Court can infer that Defendant grossly underrepresented the devices' value in order to minimize the likelihood that the packages would be inspected by U.S. government customs officials and thereby exposed as illegal exports.

In 2017, Defendant attempted the same charade again, this time with a purchase order for one cesium atomic clock directly to the manufacturer. When the manufacturer asked Defendant to fill out a certificate identifying the device's ultimate end-user, he responded (similar to his prior lie the year before) that the device would be used by his front company at a lab in California. This again was false. When the manufacturer asked for further information, Defendant responded that the product would not be exported. This again was false. When the manufacturer then asked if it could visit Defendant's California facility, Defendant canceled the transaction. The Court can

infer that he did so to prevent them from uncovering his scheme.  The manufacturer sent him a refund of about $68,000, which Defendant then wired to a bank in Hong Kong.

Neither Defendant, his co-conspirators, nor anybody else associated with them obtained the U.S. government licenses necessary for the charged transactions or attempted transactions.

In addition to these transactions, it is worth noting that Defendant anticipated the U.S. government's need to protect these cesium atomic clocks from being exported even before the U.S. government required an export license.  In May 2012, even before a U.S. license was required, Defendant sought to export cesium atomic clocks and conceal that they were going Hong Kong. He did so by misrepresenting to the seller that the end user was in an industrial suburb of Los Angeles, California, and, when asked whether they would be re-exported to Mexico and Nicaragua, affirming that they would be used only in a fictional laboratory outside Los Angeles.  Defendant repeated this charade again in early 2014, with additional cesium atomic clocks.

During the presentence investigation, Defendant objected that there was no evidence that he thought that these early exports to Hong Kong—the ones done before he needed an export license—were illegal.  But Defendant used the same methods of deception in his export transactions both before and after the license requirement, and he has admitted to having acted illegally and knowingly after a license was required.  The Court can therefore conclude that Defendant was aware of the risks of exporting the clocks even before the law caught up.  Although this evidence does not affect the calculations of Defendant guideline sentencing range, it does demonstrate Defendant did not just make a mistake once or twice, but instead acted with deceptive intent over a number of years.  He was just lucky that his first attempts were not actually illegal.

### *The Sentence*

The government's recommended sentence of 46 months of incarceration, 36 months of

supervised release, a fine, and restitution is reasonable both under the sentencing guidelines and 18 U.S.C. § 3553(a).

### Sentencing Guidelines

The Supreme Court has directed federal trial courts to initially calculate the appropriate guideline sentencing range under the advisory federal sentencing guidelines. *Gall v. United States*, 552 U.S. 38, 41 (2007). The sentencing guidelines, the Supreme Court has acknowledged, are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id*. at 46 (footnote omitted). Moreover, "the guidelines are the starting point for the fashioning of an individualized sentence, so a major deviation from them must 'be supported by a more significant justification than a minor one.'" *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 50).

This means that the Court's starting point should be the guideline sentencing range of 46 to 57 months. The parties agree that Defendant's total offense level is 23 because he evaded national security export controls, USSG § 2M5.1(a)(1)(A), and accepted responsibility by pleading guilty, USSG § 3E1.1. The parties also agree that Defendant belongs in criminal history category I. This puts the sentencing range at 46 to 57 months.

That might seem harsh, but it merely recognizes how serious it is for a defendant to violate national security export control laws. The people who decide which military application devices can go to a foreign country are members of the U.S. Department of Commerce, not the smugglers.

### Sentencing Factors in 18 U.S.C. § 3553(a)

The government's recommended sentence is reasonable not only under the guidelines, but also under the sentencing factors articulated in 18 U.S.C. § 3553(a).

### *Nature, Circumstances, and Seriousness of the Offense - § 3553(a)(1), (a)(2)(A)*

The nature, circumstances, and seriousness of the offense warrant a significant sentence of incarceration. As the Court can see from the facts related above, Defendant did not need to do too much to commit his crimes. He needed only to create a false company, lie about the products' ultimate uses and ultimate end-user, take shipment in California to make it look like the end-user was located there, repackage the products and ship them to Hong Kong with lies on the airbills to conceal the crime from U.S. customs officials. That is it: some emails, some forms, some repackaging, and some lies.

In other words, Defendant endangered national security controls while putting in minimal effort and taking minimal risk. And he did so repetitively. This callous disregard to the United States' national security and foreign policy interests deserves a significant sentence of incarceration and a fine.

It also deserves a significant period of supervised release; one year is not enough. As noted, this serious series of national security offenses was shockingly easy to do. Defendant could renew the scheme relatively easily, even given his advanced age and medical conditions. Supervised release should last the maximum 36 months to ensure he does not engage in it again.

### *Respect for the Law, Just Punishment, and Public Deterrence - § 3553(a)(2)(A),(B)*

The same facts dictate a significant sentence of incarceration, fine, and restitution to promote respect for the law, just punishment, and public deterrence. The crime is so asymmetric—minimal risks and effort, serious effects—that an insignificant sentence would likely promote disrespect for the law, deprive the public of just punishment, and encourage others to take the minimal risks and effort to violate the law.

*Specific Deterrence - § 3553(a)(2)(C)*

It might be tempting to think that Defendant has learned his lesson and will not offend again, especially given his age and minimal criminal history.  But, as noted, the offense took little effort or risk.  And Defendant engaged in this behavior over multiple years while he was otherwise retired.  And he did not just start in late 2015: he really began back in 2012, when he thought he was evading the export controls before it was actually illegal for these goods.  Reengaging in this conduct is a reasonable possibility.

*Comparable Sentences for Comparable Defendants – 1]8 U.S.C. § 3553(a)(6)*

A 46-month sentence is also warranted to keep Defendant's sentence comparable to the 40-month sentence imposed in *United States v. Tao Lin,* No. CR-18-1366-PHX-DJH (MHB) (D. Ariz.), for a defendant who similarly violated the laws controlling the export of military grade items to China.  *See, e.g.,* https://www.justice.gov/opa/pr/chinese-national-sentenced-40-months-prison-conspiring-illegally-export-military-and-space (last visited Feb. 24, 2021).  Granted, some other export violators have received lower sentences of imprisonment.  But even those sentences indicate that significant imprisonment is a significant component of punishment for exporting controlled military devices overseas.

*Characteristics of the Defendant*

The government acknowledges that two factors might at first blush suggest that Defendant not be sentenced to imprisonment:  the pandemic and Defendant's age, medical complications, and impending medical treatment.  These concerns are real and important, both generally and also specifically with regard to Defendant.  But, for the reasons given below, neither factor should lower Defendant's sentence below what would be ordered in their absence.

The pandemic should not cause the Court to impose a lower sentence than usual.  The Court should instead sentence Defendant to whatever term of incarceration it would normally impose, and then delay Defendant's date of surrender to the Bureau of Prisons as necessary.  This is exactly what Judge Saris did last August in *United States v. Serageldin,* Crim. No. 18-cr-10436-PBS (D. Mass.).  In that case, Serageldin was convicted of retaining national defense information at his home; even though Serageldin was in his late 60s and had health concerns that could complicate imprisonment during the pandemic, Judge Saris nevertheless sentenced Serageldin to jail and delayed his date of surrender to the Bureau of Prisons to a time appropriate given the pandemic.  The government assented to not only that delay, but also to two additional reporting delays, and may assent to more if necessary.  Other courts have recognized a delayed surrender date as an appropriate way to balance the public's need for a sentence of incarceration and an aged defendant's need for safety in prison during the pandemic.  Consider *United States v. Picardo*, 2020 WL 6501730 at *3 (D.N.J. Nov. 5, 2020):

> [T]here is an appropriate alternative to address Picardo's situation amid the current pandemic. *[The Court] recognizes that Picardo is 65 years old and suffers from a number of health conditions, including the effects of having contracted coronavirus earlier this year. It is also true, however, that Picardo was convicted of a serious crime of tax evasion, for which the Court imposed a well-considered penalty. In light of this dilemma, the Government has generously agreed to extend Picardo's surrender date by another 90 days and has requested that the Court so order this extension. The Court indeed finds that this is an appropriate manner in which to balance the need for Picardo to continue his recuperation with his obligation to serve the sentence imposed by the Court for his criminal offense.* Picardo expresses his view that a delayed surrender date is an inadequate solution, on the basis that the covid pandemic and rate of infection at FCI Fort Dix is unlikely to improve within this short time period. The Court, of course, cannot predict the time at which the pandemic will subside. It also cannot predict the conditions at Fort Dix in three months' time with regard to the facility's management of coronavirus transmission. It remains that Picardo has been convicted of a criminal offense and must, eventually, serve the sentence imposed by the Court.

*Id.* (emphasis added).  The government assents here to whatever delayed surrender date the Court deems necessary.

The government also takes seriously whether Defendant can obtain appropriate medical care in prison.  The government would even assent to continuing the currently-scheduled sentencing hearing if receiving more medical tests, advice, or records would assist in assessing Defendant's condition and ability to be treated in prison.  On the understanding that Defendant wants to proceed with sentencing next week, the government asked the Bureau of Prisons whether it could care for Defendant and, to inform that decision, provided the Bureau with medical facts learned from the presentence report and with some medical records produced by Defendant.  The Bureau of Prisons Health Services Administrator for the Northeast Region concluded that even with Defendant's conditions and need for treatment, the Bureau could "provide appropriate care for Mr. Yue should he be sentenced to a term of incarceration and committed to the custody of the BOP." *See* Exhibit, Bureau of Prisons Letter at 3.[1]

## *Conclusion*

For all these reasons, the Court should sentence Defendant to 46 months of imprisonment (the low end of the guideline sentencing range), 36 months of supervised release, a fine within the guideline sentencing range of $20,000 to $200,000, forfeiture of $5,690.67, and a $400 mandatory

---

[1] Before filing this memorandum, the government conferred with defense counsel about the government should seek leave to file this Bureau of Prisons letter under seal.  Defense counsel stated that this would not be necessary.

special assessment.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney
District of Massachusetts

By:    _/s/ Scott L. Garland_
        Scott L. Garland
        Assistant U.S. Attorney

***Certificate of Service***

I hereby certify these documents are being filed through the ECF system and will therefore

be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

By:    _/s/ Scott L. Garland_
        Scott L. Garland
        Assistant U.S. Attorney

Date:   February 24, 2021